**Orlando BOCACHICA, Petitioner,**

v.

**PENNSYLVANIA STATE HORSE RACING COMMISSION,
Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Jan. 16, 2004.

Decided March 1, 2004.

Alan Pincus, Las Vegas, NV, for petitioner.

Jorge M. Augusto, Harrisburg, for respondent.

Andrew J. Kramer and Paulyne A. Gardner, Norristown, for intervenors, Greenwood Racing, Inc., Keystone Turf Club and Bensalem Racing Assoc. d/b/a Phila. Park.

BEFORE: PELLEGRINI, Judge, COHN, Judge and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

Orlando Bocachica (Bocachica), a horse racing jockey, petitions for review of an order of the Commonwealth of Pennsylvania, State Horse Racing Commission (Commission) which, by adjudication and order dated July 23, 2003, upheld Bocachica's ejection from Philadelphia Park Racetrack (Philadelphia Park) by the Bensalem Racing Association. We affirm.

In his Petition for Review, Bocachica alleges that after the 10th race on June 17, 2003, the jockeys who rode in the race were surrounded by representatives of the Commission and Philadelphia Park. The jockeys were searched for a device known as a "machine" or "battery" (hereinafter "battery") which is used to shock a horse and make it go faster. No battery was found on any of the jockeys. Later, however, a battery was found discarded in the search area.

On June 23, 2003, Bocachica was forced to give an interview by a joint operation of the Commission and Philadelphia Park. Bocachica, who has a 9th grade education and a limited command of the English language, was asked questions in both English and Spanish. He was informed that he could lose his license if he failed to cooperate. Bocachica was questioned for two hours. During this questioning, Bocachica asked if he could leave to take his pregnant wife to an appointment with her doctor. However, Bocachica was not allowed to leave. Bocachica further alleges that, in a misguided effort to appease his questioners so that they would let him leave, he admitted to using a battery "in the mornings" over two years ago in New Jersey and Puerto Rico but never in a race and never at Philadelphia Park. He was then given a written confession to confirm his admissions. On June 26, 2003, his racing license was seized and he was ejected from Philadelphia Park, making it impossible for him to race. This ejection is being recognized by other parks, effectively ending his career. Bocachica then appealed this ejection to the Commission. On July 9, 2003, Bocachica recanted his earlier confession under oath at a Commission hearing. He also stated that he did not know what he was signing and that he was never read his *Miranda* rights.

In its adjudication, the Commission set forth in Findings of Fact that: Lance Morell, an agent with the Thoroughbred Racing Protective Bureau (TRPB) and the Director of Security for Philadelphia Park, received an anonymous letter that someone was selling batteries at Philadelphia Park and named several jockeys, including Bocachica, who had supposedly purchased batteries. In addition, the TRPB received an anonymous tip on their telephone hotline that Bocachica was using batteries at Philadelphia Park. Based on this information, the jockeys were searched after the 10th race on June 17, 2003. No battery was found, but one was found in the search area. Mr. Morell took a photograph of this device. On June 23, 2003, Bocachica was interviewed by Philadelphia Park and the Commission. Cesar Valdez, the Director of Enforcement for the Commission,

speaks fluent Spanish and assisted in the questioning of Bocachica.

At the July 9, 2003 Commission hearing, Mr. Valdez and Mr. Morell testified that during the June 23, 2003 interview they informed Bocachica that the battery that was found during the search had been sent to the FBI for fingerprints and that it was possible that a federal criminal case could proceed against the person or persons whose fingerprints might be a match. Upon questioning, Bocachica did not admit to using the battery found during the search. However, he did admit to using batteries at Monmouth Park in New Jersey five or six times but stopped after a Panamanian outrider threatened to turn him in. Also, he admitted to using a battery so many times during practice that he could not state a specific number of times he had used a battery. In addition, he provided details about his use of the battery and stated that he placed it in his left glove and that he used the battery on the neck of the horse. At the end of the interview, Bocachica signed a written statement that he had previously used a battery in Puerto Rico and Monmouth Park, but only in the morning, not during races.

Bocachica also testified at the Commission hearing. However, he testified that he has never used a battery, has never seen anyone use a battery and has never seen a device like the one photographed by Mr. Morell that was found at the search site. In addition, he testified that he felt a lot of pressure during the interview and that he admitted to using a battery in the mornings because he wanted to leave to go to the hospital with his pregnant wife, who delivered the baby a few days later. Also, he testified that he did not know what he was signing.

After considering the evidence, the Commission accepted the testimony of Mr. Valdez and Mr. Morell as credible and rejected the testimony of Bocachica as not credible. In its adjudication, the Commission explained that it rejected the testimony of Bocachica as not credible because his categorical denial to ever using a battery conflicted with the written statement that he signed and the testimony of Mr. Valdez and Mr. Morell. Additionally, Bocachica admitted during his interview that the only reason why he stopped using a battery at Monmouth Park was because another rider threatened to report him. The Commission also explained that "[e]ngaging in that type of prohibited conduct most certainly undermines the integrity of the sport." The Commission also noted that "the safety and health of the horses is a major concern." The Commission also explained that Bocachica "may have wanted and perhaps needed to leave the interview to be with his wife. That he would falsely admit to using an illegal device as a means to do so is simply implausible." Therefore, the Commission concluded that the Bensalem Racing Association's June 26, 2003 decision to eject Bocachica from Philadelphia Park was based on a reasoned determination that his presence at Philadelphia Park would be detrimental to the best interests of horse racing. Accordingly, by adjudication and order dated July 23, 2003, the commission upheld Bocachica's ejection from Philadelphia Park by the Bensalem Racing Association. On July 28, 2003, Bocachica filed a Petition for Review with this Court.

On appeal, Bocachica argues that: 1) the agents of the Commission and the TRPB who questioned him should be deemed to be state actors/law enforcement officers for purposes of considering the application of the United States Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Therefore, his "confession" was illegally

obtained because he was not read his *Miranda* rights by the Commission and TRPB agents regarding his Fifth Amendment protection against self-incrimination and 2) even if *Miranda* does not apply and his statement is taken as true, his actions are too remote in time and place to have a detrimental impact on the public's perception of horse racing in Pennsylvania and the Commission's decision was arbitrary, capricious and unreasonable.

■ First, we address Bocachica's argument that his "confession" was illegally obtained because he was not given his *Miranda* warning regarding his Fifth Amendment protection against self-incrimination. The Commission and Philadelphia Park argue that Bocachica was not entitled to be advised of his *Miranda* rights because is not a defendant nor has he ever been made to be a witness against himself in a criminal case. We agree with the Commission and Philadelphia Park.

Regarding the scope of Fifth Amendment Rights, our United States Supreme Court has stated that:

The privilege against selfincrimination guaranteed by the Fifth Amendment is a fundamental trial right of *criminal defendants. See Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Although conduct by law enforcement officials prior to trial may ultimately impair that right, *a constitutional violation occurs only at trial. Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972).

*United States v. Verdugo–Urquidez,* 494 U.S. 259, 264, 110 S.Ct. 1056, 1060, 108 L.Ed.2d 222 (1990) (emphasis added). Because Bocachica's ejectment from Philadelphia Park by the Bensalem Racing Association was not a criminal proceeding, nor has he ever been subjected to a criminal proceeding because of his "confession", Bo-

cachica's Fifth Amendment right to protection against self-incrimination was not implicated in this case. Accordingly, the Commission and TRPB agents were not required to read him his *Miranda* rights.

Next, we address Bocachica's argument that even if *Miranda* does not apply and if his statement is taken as true, his actions are too remote in time and place to have a detrimental impact on the public's perception of horse racing in Pennsylvania and that the Commission's decision was arbitrary, capricious and unreasonable.

■ Section 215(c) of the Race Horse Industry Reform Act (Act), Act of December 17, 1981, P.L. 435, *as amended,* provides that:

(c) *A licensed corporation may refuse admission to and eject from the enclosure of the race track operated by the corporation, any person licensed by the commissions under section 213,* employed at his occupation at the race track, whose presence there is deemed detrimental to the best interests of horse racing, citing the reasons for that determination. The action of the corporation in refusing the person admission to or ejecting him from a race meeting ground or enclosure shall have immediate effect. The person refused admission or ejected shall receive a hearing before the appropriate commission, if requested, pursuant to rules and regulations adopted for that purpose by the appropriate commission and a decision rendered following that hearing.

4 P.S. § 325.215(c) (emphasis added). In *Boyce v. Pennsylvania State Horse Racing Commission,* 651 A.2d 656, 658 (Pa. Cmwlth.1994), this Court reiterated its standard of review of Commission orders which eject jockeys from racetracks:

In reviewing the Commission's decision to eject a licensed employee from the

race track, we note that the Commission does not require that "allegations of impropriety be *proven* but [only] that the track's determination be *reasonable*," that is, based upon a "reasoned determination" that the employee's presence there would be "detrimental" to the public perception of horse racing as a sport. *Kulick v. Pennsylvania State Harness Racing Commission*, 115 Pa.Commonwealth Ct. 408, 412, 540 A.2d 620, 622, *petition for allowance of appeal denied*, 520 Pa. 620, 554 A.2d 512 (1988). As to the precise conduct warranting such a determination, this Court in *Kulick* further clarified that [s]uch proscribed conduct 'need not be criminal in nature nor proved beyond a reasonable doubt. It is sufficient that the complained-of conduct and its attending circumstances be such as to reflect negatively on the sport.' *Id.* [*Daly v. Pennsylvania State Horse Racing Comm.*, 38 Pa.Cmwlth. 77] at 81, 391 A.2d [1134] at 1134 [ (1978) ] (citation omitted).

*Id.* at 658. Furthermore, "questions of evidentiary weight and resolution of evidentiary conflicts are for the Commission, not the reviewing court. *Id.* at 659. We are required to affirm an order of the Commission unless it is not in accordance with the law or is an arbitrary, capricious or unreasonable determination lacking substantial evidence in support of its findings." *Kulick v. Pennsylvania State Harness Racing Commission*, 115 Pa.Cmwlth. 408, 540 A.2d 620, 623 (1988). *See also Martinez v. Pennsylvania State Horse Racing Commission*, 81 Pa.Cmwlth. 1, 472 A.2d 1180 (1984). As such, the question before this Court is whether the Commission's determination that the Bensalem Racing Association's decision to eject Bocachica from Philadelphia Park was based upon a "reasoned determination" that his presence would be detrimental to the public's perception of horse racing as a sport is supported by substantial evidence and whether that decision was in accordance with the law and not arbitrary, capricious or unreasonable. *Kulick*.

In this case, the Commission rejected as not credible Bocachica's testimony that his earlier confession to using a battery was not truthful. Thus, the Commission has evidence that Bocachica has used a battery in the past. This is a credibility determination that this Court does not have the power to overturn. As such, this Court must accept it as a fact that Bocachica has used a battery in the past. The Commission thought that this type of conduct is detrimental to the public's perception of horse racing as a sport, and this Court agrees. Even though Bocachica did not admit to using the battery during any race at Philadelphia Park or during a race anywhere else and the conduct he admitted to occurred years ago, he did admit to conduct that is greatly looked down upon by the public due to its detrimental effect on the horse and the supposed effect that this conduct can have on the outcome of a race to the detriment of those who have bet money on the outcome of that race. Bocachica's claim to using the battery only during practice was, understandably, not believed by the Commission since the main purpose of using a battery is to stimulate the horse to greater speed through the surprise of an electric shock which would be considerably diminished if the horse became accustomed to it during practice. But, this conduct, even if only done during practice, certainly reflects negatively on the sport of horse racing and may cause the public to assume that this conduct will start to occur during races. Thus, this Court determines that the Commission's determination that Bensalem Racing Association's decision to eject Bocachica from Philadelphia Park was based upon a "reasoned determination" that his presence

would be detrimental to the public's perception of horse racing as a sport is supported by substantial evidence.

Additionally, because the detrimental impact of this conduct is a valid concern, the Commission's decision was not capricious or unreasonable. Furthermore, because the Commission explained its reasons for upholding Bocachica's ejection from Philadelphia Park in a well-reasoned decision containing findings of fact and conclusions of law, we do not believe that its decision was arbitrary. To the contrary, the Commission has made it known that it will not tolerate this type of conduct regardless of whether it occurs during a race or during practice.

Accordingly, the order of the Commission is affirmed.

### ORDER

AND NOW, March 1, 2004, the order of the State Horse Racing Commission dated July 23, 2003 is hereby AFFIRMED.